IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THEODORE FURTADO MEDEIROS, | ) | No. CV-F-09-1177 OWW/GSA |
| | ) | |
| | ) | MEMORANDUM DECISION AND |
| | ) | ORDER GRANTING IN PART AND |
| Plaintiff, | ) | DENYING IN PART DEFENDANTS' |
| | ) | MOTION TO DISMISS FIRST |
| vs. | ) | AMENDED COMPLAINT (Doc. 36) |
| | ) | |
| | ) | |
| MERCED COUNTY SHERIFF | ) | |
| DEPUTY CLARK, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
|_____| ) | |

Plaintiff Theodore Furtado Medeiros has filed a First

Amended Complaint ("FAC") for Damages against Defendants Merced

County Sheriff Deputy Clark (#5142) and Merced County Sheriff

Deputy Eric Macias (#5185), individually and in their official

capacities, and Does 1-20.  The FAC alleges:

> 2.  On or about May 19, 2008 at approximately
> 7:30 p.m. plaintiff was asked by a friend to
> obtain a telephone number of a Frank Rose who
> lived nearby.  Plaintiff did not know Mr.
> Rose and did not know exactly where Mr. Rose
> lived.

> 3.  Plaintiff drove his Cushman into the
> wrong property located at 609 Fleming Road,
> turned around and left.  This property was a

1

ranch-type residence with a tack room nearby.

4.  Plaintiff then drove to the correct address and obtained the telephone number of Frank Rose from Cheryl L. Luman who was at the residence.  Plaintiff then telephoned his friend and gave him Mr. Rose's telephone number.

5.  While at the Rose property, plaintiff was approached by a man without any identification who stated he was a Merced County Sheriff Deputy.  He identified himself as Deputy Clark.  Deputy Clark accused plaintiff of stealing something from his tack room.  Deputy Clark looked into plaintiff's open Cushman and found nothing that may have been stolen.  Deputy Clark was at the Rose residence within a few minutes of so after plaintiff arrived at the Rose residence. Plaintiff was wearing a tank top, moccasins, and shorts.  Deputy Clark knew or should have known plaintiff had not taken any items from the 609 Fleming Road tack room.

6.  Plaintiff told Deputy Clark that without identification he was not a sheriff officer and that if he was accusing plaintiff of being a thief he would knock him on his ass. Plaintiff then got into his Cushman and drove home to call the Merced County Sheriff Department wherein he was told a deputy was already on the way.

7.  Deputy Eric Macias (and another unknown sheriff officer) drove onto plaintiff's property.  Defendants Deputy Clark and Deputy Macias then talked privately for about 20 minutes.  Thereafter, Deputy Clark told plaintiff that his son, Scott Clark, saw plaintiff walk to and from the tack room and carry something out.  Plaintiff stated, 'If that was true, then your son is a liar.' Deputy Clark appeared mad at plaintiff's response.

8.  Deputy Clark stated he saw tennis shoe prints in the tack room.  Plaintiff said he was wearing moccasins and this could be proved by going to the Rose residence because his moccasin footprints could be plainly seen

2

there and would prove his innocence.  Both
Deputy Clark and Deputy Macias refused to
investigate whether moccasin footprints were
at the Rose residence.

9.  Deputy Clark then accused plaintiff of
changing his shoes when he went into his
residence to call the Sheriff Department.
Deputy Clark took one of plaintiff's
moccasins and plaintiff had his wife bring
him a pair of tennis shoes to wear.  Deputy
Macias later told plaintiff that his tennis
shoe prints were found inside the tack room.
Plaintiff became angry at Deputy Macias for
lying.

10.  Neither Deputy Clark nor Deputy Macias
questioned Cheryl Luman at the Rose residence
to confirm plaintiff's explanation that his
moccasin footprints were at the Rose
residence.  Plaintiff's wife was not asked
about the moccasins.  Defendants never
contacted Melvin Bettancourt to confirm
plaintiff was asked to find the Rose
residence.

11.  Deputy Macias, after another private 20
minutes conversation with Deputy Clark, told
plaintiff he was being arrested for
trespassing on the property at 609 Fleming
Road.  Plaintiff was handcuffed and placed
into a sheriff's car.  After being handcuffed
in the sheriff's car for over an hour,
plaintiff was taken to jail and booked on a
first degree burglary charge.  Plaintiff was
completely surprised and shocked that he was
charged with burglary.  Bail was set at
$50,000.

12.  At the jail, Deputy Macias told
plaintiff his tennis shoe prints were found
in the tack room.  Plaintiff again requested
Deputy Macias to check his story out
concerning his moccasin prints at the Rose
residence, which would have proven his
innocence.  Deputy Macias refused.

The First Cause of Action is for violation of 42 U.S.C. §
1983 for excessive force, arrest without probable cause,

imprisonment and false and malicious prosecution, and covering up these acts and depriving plaintiff of rights to recover for his damages, and alleges in pertinent part:

> 25.   The events, acts and omissions complained of ... occurred when defendants Merced County Sheriff Deputies Clark, Macias, and Does 1-10, acting individually and in their official capacity, arrested plaintiff without probable cause knowing plaintiff had not committed any crime.  Defendants thereafter wrongfully jailed plaintiff, fabricated evidence, and made false charges knowing them to be untrue, filed a knowingly false sheriff report of the incident, and intentionally and maliciously had plaintiff prosecuted for uninvestigated felony burglary charges supported by lying and fabricated evidence made and produced by defendants.

The Second Cause of Action is for malicious prosecution, and alleges in pertinent part:

> 34.   On or about June 9, 2008, in Merced, California, defendants caused Bruce Gilbert, Deputy District Attorney of Merced County ... to file a criminal complaint in the Superior Court of Merced County.  The complaint accused plaintiff of the crime of violating Section 664/559 and Section 459 of the California Penal Code (felonies).  Plaintiff was arrested May 19, 2008, detained in custody for one day, charged by criminal complaint with committing these crimes, and arraigned on June 30. 2008.  The complaint was entitled 'The People of the State of California, Plaintiff, vs. Theodore Furtado Medeiros, Defendant, action number MF48829.

> 35.   After court appearances in the Merced County Superior Court on July 23, 2008 and August 21, 2008, the complaint filed June 9, 2008 was amended on September 24, 2009 by Merced County Deputy District Attorney Serrato, amending count one from a Penal Code Section 664/559, a felony, to a violation of Penal Code Section 601, a misdemeanor, and amended count two from a Penal Code Section

4

459 violation, a felony, to a violation of
Penal Code Section 459, second degree, a
misdemeanor.  On October 8, 2008, the Deputy
District Attorney put plaintiff's case into
'deferred prosecution' on condition plaintiff
stay 100 yards away from 609 Fleming Road for
one year until October 7, 2009 at which time
the case was dismissed.  Plaintiff had
refused to plead guilty to any of the
frivolous charges.  The condition was not an
alternate punishment of plaintiff.  Plaintiff
could not go to 609 Fleming Road without
breaking the law by committing a trespass.

36.  Defendants maliciously acted without
probable cause in initiating the prosecution
of plaintiff in that they did not honestly,
reasonably, and in good faith believe
plaintiff to be guilty of the crime charged
because they knew plaintiff merely mistakenly
drove into the wrong driveway and did not
take anything and drove out of the driveway
while looking for a residence with which he
was familiar.

37.  Defendants acted maliciously in
instigating the criminal prosecution in that
defendants knew plaintiff did not commit
either felony charge and had specific
knowledge that he was factually innocent of
the alleged criminal charges and maliciously
caused the charges to be filed, had lied and
on information and belief, had others lie to
annoy and punish plaintiff, and to
maliciously demonstrate their power as Merced
County Sheriff officers to individuals such
as plaintiff.

The Third Cause of Action is for false imprisonment and

alleges in pertinent part:

40.  On or about November 7, 2008, plaintiff
presented a claim in the amount of $1,004,000
to defendant County of Merced, which at the
time was the amount of compensatory damages
sought in this action.  A copy of the County
of Merced's Notice of Action on Claim dated
January 5, 2009 is attached as Exhibit A ...
Defendant County of Merced rejected by
operation of law plaintiff's claim on

December 22, 2009.  Plaintiff did not
photocopy the actual claimed filed.
Defendant County of Merced has plaintiff's
original form in their possession.

41.  On the night of May 19, 2008, plaintiff
was maliciously seized and arrested at his
home ... by defendants ... Clark and Macias,
without a warrant or order of commitment or
any other legal authority of any kind, when
plaintiff had not committed any crime or
public offense.  Defendants accused plaintiff
of trespassing at the time of his arrest, but
charged plaintiff with committing the offense
of Penal Code Section 664/459 [sic] and Penal
Code Section 459, but in fact the offenses
had not occurred, nor did defendants have
probable cause to believe that they had
occurred or that plaintiff had committed
them.  Defendants did not reasonably
investigate the alleged offenses, fabricated
evidence and filed false reports, and knew
plaintiff was innocent of the charged
offenses.

Defendants move to dismiss the FAC for failure to state a

claim upon which relief can be granted.

Plaintiff concedes that the Second Cause of Action is barred

by California Government Code § 821.6.

A.   <u>GOVERNING STANDARDS</u>.

A motion to dismiss under Rule 12(b)(6) tests the

sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729,

732 (9th Cir.2001).  Dismissal is warranted under Rule 12(b)(6)

where the complaint lacks a cognizable legal theory or where the

complaint presents a cognizable legal theory yet fails to plead

essential facts under that theory.  *Robertson v. Dean Witter*

*Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a

motion to dismiss under Rule 12(b)(6), the court must assume the

truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002).  However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003).  "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Williams ex rel. Tabiu v. Gerber Products Co.,* 523 F.3d 934, 938 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, *id.* at 555.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556.  The plausibility standard is not akin to a "probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully, *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of

1   'entitlement to relief.'" *Id.* at 557.   In *Ashcroft v. Iqbal*, ___

2   U.S. ___, 129 S.Ct. 1937 (2009), the Supreme Court explained:

3            Two working principles underlie our decision
             in *Twombly.*   First, the tenet that a court
4            must accept as true all of the allegations
             contained in a complaint is inapplicable to
5            legal conclusions.   Threadbare recitations of
             the elements of a cause of action, supported
6            by mere conclusory statements, do not suffice
             ... Rule 8 marks a notable and generous
7            departure from the hyper-technical, code-
             pleading regime of a prior era, but it does
8            not unlock the doors of discovery for a
             plaintiff armed with nothing more than
9            conclusions.   Second, only a complaint that
             states a plausible claim for relief survives
10           a motion to dismiss ... Determining whether a
             complaint states a plausible claim for relief
11           will ... be a context-specific task that
             requires the reviewing court to draw on its
12           judicial experience and common sense ... But
             where the well-pleaded facts do not permit
13           the court to infer more than the mere
             possibility of misconduct, the complaint has
14           alleged - but it has not 'show[n]' - 'that
             the pleader is entitled to relief.' ....

15           In keeping with these principles, a court
16           considering a motion to dismiss can choose to
             begin by identifying pleadings that, because
17           they are no more than conclusions, are not
             entitled to the assumption of truth.   While
18           legal conclusions can provide the framework
             of a complaint, they must be supported by
19           factual allegations.   When there are well-
             pleaded factual allegations, a court should
20           assume their veracity and then determine
             whether they plausibly give rise to an
21           entitlement to relief.

22        Immunities and other affirmative defenses may be upheld on

23   a motion to dismiss only when they are established on the face of

24   the complaint.   *See Morley v. Walker*, 175 F.3d 756, 759 (9th

25   Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th

26   Cir. 1980)   When ruling on a motion to dismiss, the court may

                                    8

1   consider the facts alleged in the complaint, documents attached

2   to the complaint, documents relied upon but not attached to the

3   complaint when authenticity is not contested, and matters of

4   which the court takes judicial notice. *Parrino v. FHP, Inc*, 146

5   F.3d 699, 705-706 (9th Cir.1988).

6      B.  <u>REQUEST FOR JUDICIAL NOTICE</u>.

7      Defendants request the Court take judicial notice of the

8   October 8, 2008 Minute Order in *People v. Medeiros*, No. MF48829,

9   Merced County Superior Court and Plaintiff's initial Complaint

10  filed in this action.

11     Plaintiff requests the Court take judicial notice of the

12  October 7, 2009 Minute Order in *People v. Medeiros*, No. MF48829,

13  Merced County Superior Court.

14     C.  *<u>HECK v. HUMPHREY</u>*.

15     Defendants move to dismiss the First and Third Causes of

16  Action on the ground that they are barred by *Heck v. Humphrey*,

17  512 U.S. 477 (1994).

18     In *Heck*, the Supreme Court held that a Section 1983 action

19  that calls into question the lawfulness of a plaintiff's

20  conviction or confinement is not cognizable and does not,

21  therefore, accrue until and unless the plaintiff can prove that

22  his conviction or sentence has been reversed on direct appeal,

23  expunged by executive order, declared invalid by a state tribunal

24  authorized to make such determination, or called into question by

25  a federal court's issuance of a writ of habeas corpus.  When a

26  plaintiff files a Section 1983 action, the court must determine

9

whether "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. at 487.  On the other hand, if "the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id*.  Thus, a convicted plaintiff cannot bring a section 1983 claim arising out of alleged unconstitutional activities that resulted in his criminal conviction unless the conviction is set aside.

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by action whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

*Heck* at 486-87.  Without such a showing of a "favorable termination," the person's cause of action under § 1983 has not yet accrued.  *Id*. at 489.  Thus if a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence, the complaint must be dismissed.  *Id*. at 487.

In moving to dismiss, Defendants rely on the "favorable termination" rule.  The Ninth Circuit has found that "[t]here is no question" that the "favorable termination" rule bars a convicted plaintiff's claim that defendants falsely arrested him and brought unfounded charges.  *Smithart v. Towery*, 79 F.3d 951, 952 (9th Cir. 1996).  Wrongful arrest and bringing false charges could not have occurred unless the plaintiff was innocent of the crime for which he was convicted.  *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006).

Defendants argue that the fact that "deferred entry of judgment" was entered against Plaintiff in the underlying criminal proceedings on the condition that Plaintiff stay more than 100 yards away from 609 Fleming Road for one year does not constitute a "favorable termination" for purposes of *Heck v. Humphrey*.

The FAC does not allege a deferred entry of judgment; it alleges "the Deputy District Attorney put plaintiff's case into 'deferred prosecution' on condition plaintiff stay 100 yards away from 609 Fleming Road for one year until October 7, 2009 at which time the case was dismissed."  Although Plaintiff correctly asserts that California Penal Code §§ 1000-1000.8 limits deferred entry of judgment to specified narcotics and drug abuse cases, as Defendants note, California Penal Code §§ 1001-1001.9 provides for misdemeanor pretrial diversion.  It appears that this is what occurred in Plaintiff's underlying criminal case.

"[P]retrial diversion refers to the procedure of postponing

11

prosecution of an offense filed as a misdemeanor either temporarily or permanently at any point in the judicial process from the point at which the accused is charged until adjudication."  Cal.Penal Code § 1001.1.  Section 1001.2(b) provides:

> The district attorney of each county shall review annually any diversion program established pursuant to this chapter, and no program shall continue without the approval of the district attorney.  No person shall be diverted under a program unless it has been approved by the district attorney.  Nothing in this subdivision shall authorize the prosecutor to determine whether a particular defendant shall be diverted.

§Section 1001.3 provides that "[a]t no time shall a defendant be required to make an admission of guilt as a prerequisite for placement in a pretrial diversion program."  A divertee is entitled to a hearing before his pretrial diverson can be terminated for cause, Section 1001.4, and no statement or information procured therefrom, made by the defendant in connection with determination of eligibility for diversion or made subsequently to the granting of diversion or while participating in a diversion program, shall be admissible in any action or proceeding.  Section 1001.5.  At the time a defendant's case is diverted, all bail is exonerated.  Section 1001.6.  "If the divertee has performed satisfactorily during the period of diversion, the criminal charges shall be dismissed at the end of the period of diversion."  Section 1001.9 provides:

> (a) Any record filed with the Department of Justice shall indicate the disposition in

12

those cases diverted pursuant to this chapter.  Upon successful completion of a diversion program, the arrest upon which the diversion was based shall be deemed to have never occurred.  The divertee may indicate in response to any question concerning his or her prior criminal record that he or she was not arrested or diverted for the offense, except as specified in subdivision (b).  A record pertaining to an arrest resulting in successful completion of a diversion program shall not, without the divertee's consent, be used in any way that could result in the denial of any employment, benefit, license, or certificate.

(b) The divertee shall be advised that, regardless of his or her successful completion of diversion, the arrest upon which the diversion was based may be disclosed by the Department of Justice in response to any peace officer application request and that, notwithstanding subdivision (a), this section does not relieve him or her of the obligation to disclose the arrest in response to any direct question contained in any questionnaire or application for a position as a peace officer, as defined in Section 830.

Defendants cite a number of decisions in support of their position.

In *United States v. Brosser*, 866 F.2d 315 (9th Cir.1989), the defendant, charged with forgery under the Assimilative Crimes Act, pled guilty to the charge and moved to defer acceptance of her guilty plea under Hawaii law.  On appeal, the United States argued that the Hawaii deferred acceptance rule is a form of punishment within the meaning of the ACA.  The Ninth Circuit agreed:

In our view the Hawaii deferred-acceptance rule constitutes a 'punishment' for purposes of the ACA's requirement that criminal

13

> defendants prosecuted under the ACA receive
> 'a like punishment' comparable to what they
> would receive in state court proceedings.  In
> essence, the Hawaii rule recognizes that the
> fact of having a felony on one's criminal
> record may itself constitute a substantial
> penalty for a crime.  Giving an individual a
> criminal record labels her a law violator, a
> label that carries with it a range of social
> and economic disabilities.  What the Hawaii
> rule does is substitute one penalty for
> another: it gives a defendant an opportunity
> to serve a probation-like sentence in lieu of
> having a felony put on her record, on the
> understanding that if probation is violated
> the guilty plea will be accepted.  Like any
> probationary sentence, the magistrate's order
> in this case restricted the appellant's
> liberty and backed the restriction with the
> threat that if the order was violated she
> would suffer a greater penalty.
>
> We think it is a matter of common sense that
> the deferred-acceptance rule is designed as a
> form of punishment, representing Hawaii's
> judgment that in some circumstances crime is
> more appropriately sanctioned by a probation-
> like sentence than by the stigma of a
> permanent criminal record.

866 F.2d at 316-317.

    In *United States v. Sylve*, 135 F.3d 680 (9th Cir.1998), the

defendant, who was charged under the Assimilative Crimes Act with

driving under the influence of alcohol within a federal enclave

in the State of Washington, moved for deferred prosecution under

Washington law.  The motion was denied.  On appeal, the Ninth

Circuit held that Washington's deferred prosecution program was a

form of punishment to be incorporated through the ACA:

> Washington's deferred prosecution scheme is a
> form of preconviction probation available to
> persons charged with misdemeanors or gross
> misdemeanors who admit under oath that their
> wrongful conduct resulted from alcoholism,

14

drug addiction, or mental problems for which
they are in need of treatment ... To qualify,
the petitioner must execute a statement
waiving his right to testify, the right to a
speedy trial, the right to call witnesses to
testify, the right to present evidence in his
defense, and the right to a jury trial ... He
must stipulate to the admissibility and
sufficiency of the facts contained in the
written police report ... He must acknowledge
'that the statement will be entered and used
to support a finding of guilty if the court
finds cause to revoke the order granting
deferred prosecution.' ... The petitioner is
'advised that the court will not accept a
petition for deferred prosecution from a
person who sincerely believes that he or she
is innocent of the charges or sincerely
believes that he or she does not, in fact,
suffer from alcoholism, drug addiction, or
mental problems.' ....

The two year alcoholism program mandated
under the deferred prosecution program is
rigorous, imposing various disabilities upon
the participant such as twice-weekly recovery
meetings, relinquishment of the right to
refuse certain prescription drugs, and total
abstinence from alcohol and nonprescribed
drugs.  The participant's driving privileges
are placed on probationary status for five
years by the department of motor vehicle
licensing ... The court may also appoint the
probation department to supervise the
petitioner, making contact 'at least once
every six months.' ....

If a petitioner who has been accepted for
deferred prosecution fails to fulfill any
term or condition of his treatment plan, the
overseeing facility must immediately report
the breach to the court ... The court must
then hold a hearing to determine whether the
petitioner should be removed from the
deferred prosecution program ... If the court
revokes the petitioner's deferred
prosecution, 'the court shall enter judgment
pursuant to RCW 10.05.020.' ... That section
provides that the petitioner's statement
waiving rights and stipulating to facts 'will
be entered and used to support a finding of

15

guilty.' ....

The Washington statute envisions an extremely abbreviated process for the bench trial, because almost every possible defense usually open to a defendant is foreclosed.  The official form to be used by petitioners contains the following description: 'Petitioner understands there will not be a trial; the Judge will simply read the police report to determine guilt or innocence of Petitioner.'

...

The Supreme Court of Washington has determined that the deferred prosecution scheme at issue is 'a form of sentencing.' ... Thus, it is apparent that the Supreme Court of Washington views the deferred prosecution program as a form of punishment.

The government argues that the deferred prosecution scheme cannot be characterized as punishment because it precedes, rather than follows, the usual prerequisites to punishment: plea, acceptance of plea, trial, and conviction.  However, the deferred acceptance (of plea) scheme found to be 'punishment' in *Bosser* also effectively postponed the acceptance of plea and conviction stages.  It also obviated the need for a trial.  The only difference between Washington and Hawaii's programs is that in Hawaii, petitioners must formally lodge guilty pleas.  In Washington, they need not do so.  However, Washington petitioners must waive all essential rights, stipulate to all facts necessary to ensure their conviction, and disclaim their innocence.  Thus, the difference between the two programs is a formality: Washington's deferred prosecution scheme is functionally equivalent to Hawaii's deferred acceptance scheme.

Further, like the Hawaii legislature in *Bosser*, the Washington state legislature appears to have intended to defer (and in successful cases, entirely avoid) much of the formal procedure.  The granting of deferred prosecution is conditioned upon the

16

> petitioner enabling the state to develop and
> preserve all the evidence necessary to ensure
> a swift verdict of guilty in a summary
> proceeding should the petitioner stray from
> the substance abuse program.  As with the
> Hawaii law, the petitioner in Washington
> state places his head on the block, where it
> remains for the probationary period.

135 F.3d at 681-683.

In *DeLeon v. City of Corpus Christi*, 488 F.3d 649 (5th Cir.2007), the plaintiff appealed the district court's dismissal of his Section 1983 action as barred by *Heck v. Humphrey.*  In the underlying criminal proceeding, the plaintiff was charged with aggravated assault of a police officer, pleaded guilty, and received a deferred adjudication.  The Texas Code of Criminal Procedure, art. 42.01, § 1, provided:

> [W]hen in the judge's opinion the best
> interest of society and the defendant will be
> served, the judge may, after receiving a plea
> of guilty or a plea of nolo contendere,
> hearing the evidence, and finding that it
> substantiates the defendant's guilt, defer
> further proceedings without entering an
> adjudication of guilt, and place the
> defendant on community service.

The district court ruled that plaintiff's deferred adjudication barred his section 1983 claims pursuant to *Heck* because he had admitted his guilty to aggravated assault in a judicial confession.  The Fifth Circuit addressed "whether a deferred adjudication in Texas is a 'sentence or conviction' for the purposes of *Heck.  Id.* at 652-653.  In pertinent part, the Fifth Circuit ruled:

> A second argument remains, resting on a
> different characterization of an order

17

deferring adjudication, viewing it as a final
judicial act, not as one state in an ongoing
criminal proceeding.  And while unknown at
common law in 1871, it is fairly viewed as
akin to judgments of conviction.  Deferred
adjudication was not intended as a radical
departure, rather, the Texas legislature
enacted these procedures with 'the purpose
... to remove from existing statutes the
limitations ... that have acted as barriers
to effective systems of community supervision
in the public interest.'  And although the
Texas courts have in all circumstances held
that these orders are not convictions, they
have been accorded finality, for instance in
the appellate context, where the defendant is
released on bail pending the disposition of
his appeal of a deferred adjudication order,
which does not become final until the
appellate court's mandate issues.  Likewise,
although there is no finding of guilt, there
is at least a judicial finding that the
evidence substantiates the defendant's guilt,
followed by conditions of probation that may
include a fine and incarceration.  We
conclude that a deferred adjudication order
is a conviction for the purposes of *Heck*'s
favorable termination rule.  This case does
not require that we decide whether a
successfully completed deferred adjudication,
with its more limited collateral consequences
under Texas law, is also a conviction for the
purposes of *Heck*, and we do not decide that
question.

*Id.* at 655-656.

A case cited by Defendants in order to distinguish it is

*McClish v. Nugent*, 483 F.3d 1231 (11th Cir.2007).  In *McClish*, a

plaintiff brought a Section 1983 action arising out of his

arrest.  The Eleventh Circuit ruled:

Holmberg's § 1983 claim arose out of his
arrest for allegedly interfering with the
ongoing arrest of McClish by Deputies Terry
and Calderone.  The deputies arrested
Holmberg for 'resisting arrest without
violence,' ... and the charge was eventually

18

dismissed without prejudice pursuant to Florida's pretrial intervention program, *see* Fla. Stat. § 834.02.  The district court determined that *Heck* barred Holmberg from bringing a § 1983 claim because of his participation in PTI.  Although we have never determined that participation in PTI barred a subsequent § 1983 claim, the district court cited to Second, Third, and Fifth Circuit cases holding that a defendant's participation in PTI barred subsequent § 1983 claims ... (citing *Gilles v. Davis*, 427 F.3d 197 (3rd Cir.2005); *Taylor v. Gregg*, 36 F.3d 453 (5th Cir.1994); *Roesch v. Otarola*, 980 F.2d 850 (2nd Cir.1992).  The district court concluded that 'Holmberg's participation in PTI, which resulted in a dismissal of the charge of resisting arrest without violence, is not a termination in his favor, and, therefore, he is barred from bringing a § 1983 claim for false arrest.'  We disagree.

*Heck* is inapposite.  The issue is not, as the district court saw it, whether Holmberg's participation in PTI amounted to a favorable termination on the merits.  Instead, the question is an antecedent one - whether *Heck* applies at all since Holmberg was never convicted of *any* crime.  The primary category of cases barred by *Heck* - suits seeking damages for an allegedly unconstitutional conviction or imprisonment - is plainly inapplicable.  Instead, the district court based its *Heck* ruling on the second, indirect category of cases barred by *Heck*: suits to recover damages 'for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid.' ... The problem with using this second *Heck* category to bar Holmberg's § 1983 suit is definitional - to prevail in his § 1983 suit, Holmberg would not have to 'negate an element of the offense of which he has been convicted,' because he was never convicted of *any* offense.

*Id.* at 1251.

    In *Vasquez Arroyo v. Starks*, 589 F.3d 1091 (10th Cir.2009), the plaintiff brought a Section 1983 action alleging that, in two

19

separate incidents, Kansas law enforcement authorities falsely

arrested him for driving under the influence and disorderly

conduct and forged plaintiff's signature on a pre-trial diversion

agreement.   The District Court dismissed the action pursuant to

the "favorable termination" rule of *Heck*.   The Tenth Circuit

reversed:

> ... Contrary to the district court's conclusion, under Kansas law a '[d]iversion is ... a means to avoid a judgment of criminal guilt,' the opposite of a conviction.
>
> Here, there is no related underlying conviction that could be invalidated by Mr. Vasquez's § 1983 actions.  The diversion agreements resulted in deferral of prosecution of the offenses at issue.  As a consequence, under Kansas law there are no 'outstanding 'judgments,' or 'convictions or sentences' against Mr. Vasquez either for driving under the influence and transportation of open containers of alcohol, or for disorderly conduct and battery – the charges from which his § 1983 claims stem.
>
> Courts disagree as to whether the *Heck* bar applies to pre-trial diversion programs similar to diversion agreements ... In our judgment, holding that the *Heck* bar applies to pre-trial diversions misses the mark.
>
> The Supreme Court in *Wallace* made clear that the *Heck* bar comes into play only when there is an actual conviction, not an anticipated one.   549 U.S. at 393 ... The Court explained why this is so:
>
>> What petitioner seeks ... is the adoption of a principle that goes well beyond *Heck*: that an action which would impugn *an anticipated future conviction* cannot be brought until that conviction occurs and is set aside.   The impracticality of such a rule should be obvious.   In

20

> an action for false arrest it would
> require the plaintiff (and if he
> brings suit promptly, the court) to
> speculate about whether a
> prosecution will be brought,
> whether it will result in
> conviction, and whether the pending
> civil action will impugn that
> verdict ... all this at a time when
> it can hardly be known what
> evidence the prosecution has in its
> possession.  And what if the
> plaintiff (or the court) guesses
> wrong, and the anticipated future
> conviction never occurs, because of
> acquittal or dismissal?  We are not
> disposed to embrace this bizarre
> extension of *Heck*.

> *Id.; see also Butler*, 482 F.3d at 1279 ('The
> starting point for the application of *Heck*
> ... is the existence of an underlying
> conviction or sentence that is tied to the
> conduct alleged in the § 1983 action.  In
> other words, a § 1983 action implicates *Heck*
> only as it relates to the conviction that it
> would be directly invalidating.').  There is
> no such conviction here.

589 F.3d at 1095-1096.

Plaintiff responds that *Heck v. Humphrey* does not bar his §
1983 claim and the cases relied upon by Defendants are
inapplicable:

> Once discovery is completed, depositions will
> show that plaintiff refused to plead guilty
> to any crime and stated in effect that he did
> not care what the District Attorney did (in
> his underlying case), but he was not guilty
> of anything.  The District Attorney for
> reasons yet to be determined deferred
> plaintiff's case for one year.  The only
> condition was that plaintiff could not go
> within 100 yards of 609 Fleming Road.  The
> condition was <u>not</u> an alternative punishment.
> Plaintiff did not care that the District
> Attorney stated he could not goto 609 Fleming
> Road.  This address is the address where Mr.

21

> Medeiros mistakenly went in his attempt to
> locate another residence.  This is the
> residence where the defendants maliciously
> alleged plaintiff committed a residential
> burglary.  609 Fleming Road is located down a
> private road on a private ranch in the
> country.  Evidence will show that Mr.
> Medeiros had no intention of ever going to
> 609 Fleming Road before the deferred judgment
> was entered and has no reason to go there
> after the deferred judgment.  The 609 Fleming
> Road address is a fenced in property and
> plaintiff may be trespassing if he went to
> Fleming Road.

Defendants reply that whether or not Plaintiff pled guilty is irrelevant because Plaintiff stipulated to a restraining order for a full year as a deferred prosecution.

The Ninth Circuit decisions upon which Defendants rely do not address the application of *Heck v. Humphrey* and do not control resolution of this issue.

In *Nonnette v. Small*, 316 F.3d 872 (9th Cir.2002), *cert. denied*, 540 U.S. 1218 (2004), the plaintiff brought a Section 1983 action challenging the revocation of good time credits and the imposition of administrative segregation following a prison disciplinary proceeding.  The District Court dismissed the case based on *Heck*.  By the time the appeal was heard, the plaintiff had been released from prison and was on parole.  The Ninth Circuit noted that as a result of his release, any federal habeas challenge to the disciplinary proceedings would be dismissed as moot, as plaintiff had "fully served the period of incarceration that he is attacking."  *Id*. at 875-876.  Although a prisoner who has completed a sentence and seeks to challenge his or her

22

conviction in habeas may do so because of the "collateral consequences that survive [the prisoner's release]," habeas is not available to former prisoners who attack a deprivation of good time credits because such former prisoners who challenge a term of incarceration for a parole violation have no collateral consequences stemming from the challenged action. *Id.,* citing *Spencer v. Kemna*, 523 U.S. 1, 14-16 (1998). The Ninth Circuit then inquired whether the unavailability of a remedy in habeas corpus because of mootness permitted the plaintiff to maintain a Section 1983 action for damages, even though success in that action would necessarily imply the invalidity of the disciplinary proceedings that caused revocation of the good-time credits. *Id.* at 876. "Informed as we are by the opinions in *Spencer*, we conclude that *Heck* does not preclude Nonnette's § 1983 action." *Id.* at 877. In *Guerrero v. Gates*, 442 F.3d 697, 704-705 (9th Cir.2006), the Ninth Circuit ruled emphasized that where habeas relief is not available through no fault of the plaintiff, *Heck* does not bar a Section 1983 action.

Here, because Plaintiff was never convicted of any crime, he could not challenge the misdemeanor pretrial diversion through appeal or habeas corpus. Plaintiff was never incarcerated and suffers no collateral consequences as a result of the misdemeanor pretrial diversion. *See Nickerson v. Portland Police Bureau*, 2008 WL 4449874 at *8 (D.Or., Sept. 30, 2008): "With no habeas remedy available, and no allegations of any collateral consequences stemming from a traffic conviction, *Heck* does not

23

1  bar plaintiff's section 1983 equal protection claim."); *see also*

2  *Cole v. Doe I Thru 2 Officers of the City of Emeryville Police*

3  *Dep't.*, 387 F.Supp.2d 1084, 1092-1093 (N.D.Cal.2005).

4      Defendants' motion to dismiss the First Cause of Action as

5  barred by *Heck* is DENIED.[1]

6      D.   <u>PROBABLE CAUSE</u>.

7      Defendants move to dismiss all three causes of action on the

8  ground that probable cause to arrest is demonstrated by the

9  allegations of the Complaint and the FAC.

10     "'Probable cause to arrest exists when officers have

11 knowledge or reasonably trustworthy information sufficient to

12 lead a person of reasonable caution to believe that an offense

13 has been or is being committed by the person arrested.'" *Rodis v.*

14 *City and County of San Francisco*, 558 F.3d 964, 969 (9th

15 Cir.2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 1050 (2010).

16     At the hearing, Defendants referred to California Penal Code

17

18     [1]**To the extent that Defendants' motion to dismiss based on**
   *Heck* **is directed to the state law causes of action, by its terms,**
19 *Heck v. Humphrey* **applies to a Section 1983 action.** *See Nuno v.*
   *County of San Bernardino*, **58 F.Supp.2d 1127, 1130 n.3**
20 **(C.D.Cal.1999):**

21          **Defendants similarly fail to address the state**
            **claims pled in the third cause of action of**
22          **the FAC.** *Heck* **is a rule of federal law that,**
            **absent its adoption by the California courts,**
23          **has no application to these state law claims.**
            **Nonetheless, the Court concludes that, if the**
24          **federal civil rights causes of action must be**
            **dismissed, it will decline to exercise its**
25          **discretion to retain the state law causes of**
            **action.**
26

                                    24

§ 602(m):[2]

>           Except as provided in paragraph (2) of
>           subdivision (v), subdivision (x), and Section
>           602.8, every person who willfully commits a
>           trespass by any of the following acts is
>           guilty of a misdemeanor:
>
>           ...
>
>           (m) Entering and occupying real property or
>           structures of any kind without the consent of
>           the owner, the owner's agent, or the person
>           in lawful possession.

California Penal Code § 7 provides:

>           The following words have in this code the
>           signification attached to them in this
>           section, unless otherwise apparent from the
>           context:
>
>           1.   The word 'wilfully,' when applied to the
>           intent with which an act is done or omitted,
>           implies simply a purpose or willingness to
>           commit the act, or make the omission referred
>           to.   It does not require any intent to
>           violate law, or to injure another, or to
>           acquire any advantage.

A violation of Section 602(m) requires occupation of the

property, "'a nontransient, continuous type of possession.'" *In*

---

[2]California Penal Code § 602.8(a) provides:

>           Any person who without the written permission
>           of the landowner, the owner's agent, or the
>           person in lawful possession of the land,
>           wilfully enters any lands under cultivation or
>           enclosed by fence, belonging to, or occupied
>           by, another, or who willfully enters upon
>           uncultivated or unenclosed lands where signs
>           forbidding trespass are displayed at intervals
>           not less than three to the mile along all
>           exterior boundaries and at all roads and
>           trails entering the land, is guilty of a
>           public offense.

*re Catalano,* 29 Cal.3d 1, 10 n. 8 (1981), citing *People v. Wilkinson,* 248 Cal.App.2d Supp. 906, 910 (1967); *see also Edgerly v. City and County of San Francisco*, 599 F.3d 946, 954 (9th Cir.2010):

> The Officers cited Edgerly for violating California Penal Code section 602(*l*), now section 602(m). Under this section, a person commits a trespass if he or she 'wilfully ... [e]nter[s] and occup[ies] real property or structures of any kind without the consent of the owner.' Long before Edgerly's arrest, however, the California Supreme Court had clearly held that section 602(*l*) 'requires occupation of the property, a "nontransient, continuous type of possession."' *In re Catalano* ... As *Wilkinson* explained, section 602(*l*) requires the specific 'inten[t] to remain permanently, or until ousted.' ...; see also Cal. Jury Instr., Crim., No. 16.340 (6th ed.1996)(requiring, for a conviction under section 602(*l*), proof that the defendant 'entered and occupied the property with the specific intent to dispossess those lawfully entitled to possession'). Here, the Officers knew only that Edgerly was not a resident of the Cooperative and that he had been on the property for a matter of minutes. On the basis of these facts, a reasonable officer would not have believed that Edgerly had violated or was about to violate section 602(*l*).

Defendants refer to allegations in Plaintiff's initial complaint where he admits he was on the property without permission:

> • Plaintiff drove into the driveway and at the bottom of the driveway looked around for some sign of construction equipment since he figured that if Sonny Rose here there would be some type of construction equipment present. Plaintiff did not see anything that looked like a person in the construction business lived there and knew he must be in the wrong residence. [2:18-22]

> • The man on the dirt bike wanted to know if
> plaintiff has just been in his driveway and
> what was he doing there.  (A few days later
> plaintiff found out that the man on the dirt
> bike did not live there but that his mother-
> in-law lives there and she was not home at
> the time.  Plaintiff told the man on the dirt
> bike that he had made a mistake by going to
> his house and the man left. [3:13-17].
>
> • Defendant Sheriff Deputy Eric Macias asked
> what plaintiff was doing on the Cohen
> property and plaintiff again repeated he was
> looking for Sonny Rose's house and that he
> had gone to the wrong residence.  After a few
> minutes, defendant ... Macias got a call on
> his car radio and said that he was placing me
> under arrest for trespassing ... [¶]
> Plaintiff told ... Macias that if turning
> around in a driveway constituted trespassing,
> plaintiff guesses he was trespassing. [5:13-
> 17, 20-21].

Defendants also refer to the allegations in the initial Complaint

that Plaintiff's footprints were found in the tack room and

Plaintiff's tire tracks were all around the dirt on the property:

> • Defendant ... Macias and defendant ...
> Clark approached plaintiff and said they
> wanted to take one of his moccasins to
> compare it to the tracks in the tack room
> [5:7-9]
>
> • He asked plaintiff to show him the bottom
> of his shoes.  Plaintiff did as he was asked
> and ... Macias appeared excited and said he
> knew plaintiff had done it because those were
> the tracks all around the tack room. [7:6-8].
>
> • ... Macias told plaintiff there were tire
> tracks from plaintiff's Ranger all around the
> dirt on the Cohen property. [7:12-13].

Defendants refer to the allegations in the FAC that "Deputy Clark

told plaintiff that his son, Scott Clark, saw plaintiff walk to

and from the tack room and carry something out."

27

1      As explained in *Team Enterprises, LLP v. Western Inv. Real*

2  *Estate Trust*, 2009 WL 1451635 at *4 (E.D.Cal., May 20, 2009):

3              Statements in a pleading may be party
             admission.  *See Andrews v. Metro North*
4           *Commuter R.R. Co.*, 882 F.2d 705, 707 (2nd
             Cir.1989) (a prior pleading may be admissible
5           in evidence against the pleader as an
             admission or prior inconsistent statement).
6           However, the factual representations may be
             explained.  *Contractor Util. Sales Co., Inc.*
7           *v. Certainteed Prods. Corp.*, 638 F.2d 1061,
             1084 (7th Cir.1981); *Intergen N.V. v. Grina*,
8           344 F.3d 134, 144 (1st Cir.2003)(information
             may be learned through discovery.
9           Accordingly, whether the Team Enterprises,
             *Inc.* was converted to the Team Enterprise,
10          *LLC* will be subject to proof.  The motion to
             dismiss on this point is denied.

11

12      It is highly doubtful that the allegations in the initial

13  Complaint constitute admissions; the allegations purport to

14  recite what the Defendants told Plaintiff, all of which Plaintiff

15  denies is true.  Accepted as true, these allegations do not

16  appear to provide probable cause to arrest for trespassing in

17  violation of Penal Code § 602(m).  Although Plaintiff admits he

18  was on the property and he did not have permission to enter, the

19  allegations in the FAC do not infer that Plaintiff entered the

20  property to occupy it.  The officers allegedly found footprints

21  and tire tracks on the property that matched Plaintiff's shoes

22  and tires, and Defendant Clark's son told Defendant Clark that he

23  had seen Plaintiff go into the tack room and carry something out.

24  The fact that Plaintiff denies he went into the tack room or even

25  got out of his car does not negate probable cause unless

26  Plaintiff can establish that Defendants made up everything,

                              28

including the report by Defendant Clark's son.  Defendants'
motion to dismiss on the ground that probable cause exists on the
face of the FAC is DENIED.  Factual issues that can be resolved
only by summary judgment or trial exist.

        E.  <u>QUALIFIED IMMUNITY</u>.

        Defendants move to dismiss the First Cause of Action on the
ground of qualified immunity from liability for damages under
Section 1983.

        Qualified immunity serves to shield government officials
"from liability for civil damages insofar as their conduct does
not violate clearly established statutory or constitutional
rights of which a reasonable person would have known."  *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982).  In *Pearson v. Callahan*,
___ U.S. ___, 129 S. Ct. 808 (2009), the Supreme Court summarized
the purpose of qualified immunity:

> Qualified immunity balances two important
> interests-the need to hold public officials
> accountable when they exercise power
> irresponsibly and the need to shield
> officials from harassment, distraction, and
> liability when they perform their duties
> reasonably. The protection of qualified
> immunity applies regardless of whether the
> government official's error is "a mistake of
> law, a mistake of fact, or a mistake based on
> mixed questions of law and fact." *Groh v.
> Ramirez*, 540 U.S. 551 (2004) (Kennedy, J.,
> dissenting) (citing *Butz v. Economou*, 438
> U.S. 478, 507 (1978) (noting that qualified
> immunity covers "mere mistakes in judgment,
> whether the mistake is one of fact or one of
> law")).
>
> Because qualified immunity is "an immunity
> from suit rather than a mere defense to
> liability ... it is effectively lost if a

29

case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis deleted). Indeed, we have made clear that the "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery." *Anderson v. Creighton*, 483 U.S. 635, 640, n. 2 (1987). Accordingly, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam).

Deciding qualified immunity normally entails a two-step analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity. However, if the court determines that the conduct did violate a constitutional right, *Saucier*'s second prong requires the court to determine whether, at the time of the violation, the constitutional right was "clearly established." *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. This inquiry is wholly objective and is undertaken in light of the totality of the specific factual circumstances of each case. *Id*. at 201. Even if the violated right is clearly established,

1  *Saucier* recognized that, in certain situations, it may be

2  difficult for a police officer to determine how to apply the

3  relevant legal doctrine to the particular circumstances he faces.

4  If an officer makes a mistake in applying the relevant legal

5  doctrine, he is not precluded from claiming qualified immunity so

6  long as the mistake is reasonable.  If "the officer's mistake as

7  to what the law requires is reasonable, ... the officer is

8  entitled to the immunity defense." *Id.* at 205.  In *Pearson*, the

9  Supreme Court ruled that "while the sequence set forth [in

10 *Saucier*] is often appropriate, it should no longer be regarded as

11 mandatory." *Pearson, id.* at 818.  "The judges of the district

12 courts and the courts of appeal should be permitted to exercise

13 their sound discretion in deciding which of the two prongs of the

14 qualified immunity analysis should be addressed first in light of

15 the circumstances in the particular case at hand." *Id.*   In

16 *Brosseau v. Haugan*, 543 U.S. 194 (2004), the Supreme Court

17 reiterated:

18         Qualified immunity shields an officer from
          suit when she makes a decision that, even if
19         constitutionally deficient, reasonably
          misapprehends the law governing the
20         circumstances she confronted. *Saucier v.
          Katz*, 533 U.S., at 206 (qualified immunity
21         operates 'to protect officers from the
          sometimes "hazy border between excessive and
22         acceptable force"').  Because the focus is on
          whether the officer had fair notice that her
23         conduct was unlawful, reasonableness is
          judged against the backdrop of the law at the
24         time of the conduct.  If the law at that time
          did not clearly establish that the officer's
25         conduct would violate the Constitution, the
          officer should not be subject to liability
26         or, indeed, even the burdens of litigation.

31

It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' *Id.*, at 201. As we previously said in this very context:

'[T]here is no doubt that *Graham v. Connor, supra*, clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet, that is not enough. Rather, we emphasized in *Anderson* [*v. Creighton*] "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.' ... The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' ...

The Court of Appeals acknowledged this statement of law, but then proceeded to find fair warning in the general tests set out in *Graham* and *Garner* ... In so doing, it was mistaken. *Graham* and *Garner,* following the lead of the Fourth Amendment's text, are cast at a high level of generality. See *Graham v. Connor*, *supra*, at 396 ('"[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application"'). Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.'

543 U.S. at 198-199. However, as explained in *Wilkins v. City of*

*Oakland*, 350 F.3d 949, 956 (9ᵗʰ Cir.2003), *cert. denied sub nom.*

*Scarrot v. Wilkins*, 543 U.S. 811 (2004):

> Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate. *See Saucier*, 533 U.S. at 216 ... (Ginsberg, J., concurring)('Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official.').

Probable cause to arrest exists if, "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the plaintiff] had committed a crime. *Beier v. City of Lewiston*, 354 F.2d 1058, 1065 (9th Cir.2004). The proper inquiry where an officer is claiming qualified immunity for a false arrest claim is "whether a reasonable officer could have believed that probable cause existed to arrest the plaintiff." *Franklin v. Fox*, 312 F.3d 423, 437 (9th Cir.2002). Qualified immunity does not depend on whether probable cause actually existed.

Defendants argue that the allegations in the initial Complaint and the FAC demonstrate their entitlement to qualified immunity. Defendants contend that they were not required to perform a final investigation proving guilt beyond a reasonable doubt and that, even if there assessment of the facts was incorrect, those facts nonetheless established probable cause that Plaintiff had trespassed on property and taken something from the tack room on that property.

33

Plaintiff responds that, because a violation of California Penal Code § 459 carries a mandatory four year prison term, reasonable officers would have conducted a thorough investigation into the facts of the case.  Plaintiff further asserts, upon information and belief, that discovery will show:

1.  Deputy Clark knowingly used his son, Scott Clark, either by alleging his son stated he saw plaintiff enter the tack room and leave the tack room carrying something when his son did not so state, or by having his son actually lie by stating that his son told him he saw plaintiff walk to the tack room and carry something out of the tack room.

2.  Initially Deputy Clark stated he found tennis shoe prints in the tack room (allegedly broken into by plaintiff and this is stated in the police report) and accused plaintiff of changing into moccasins when plaintiff went to his house to call police. Defendants moving papers state there were moccasins in the tack room.

3.  Plaintiff informed both Deputy Clark and Deputy Macias that his moccasin footprints would be at the Sonny Rose property because he walked around the goat heads.  Both deputies refused to investigate to see if there were moccasin prints at the Sonny Rose residence.

4.  Deputy Macias had plaintiff give one of his moccasins to Deputy Clark who left to go to the tack room.

In defendant's [sic] moving papers defendant states moccasin tracks were found in the tack room.  Plaintiff's amended complaint alleges on information and belief that if these moccasin tracts [sic] were there, they were put there by defendant officers.

5.  Defendants did not contact witness Melvin Bettancourt to verify the reason plaintiff gave for mistakenly driving into the 609

34

Fleming Road address (to go to the Sonny Rose
residence to get the phone number for
Melvin).  Defendants intentionally and
maliciously did not contact Cheryl Luman who
was at the Rose residence to verify why
plaintiff was at the Rose residence and to
verify plaintiff was wearing moccasins.

6.  Defendants did not contact Mrs. Cohen
(assuming this is her name) who owns the
residence at 609 Fleming Road to determine if
her home or tack room had been broken into or
if anything was missing from either her tack
room or her home.  If a reasonable
investigation was made, defendants would have
found that nothing was missing from the tack
room or home and that there was no break-in
of either the tack room or residence.
Defendants would have found that plaintiff's
explanation was true and that he committed no
crime.

7.  Deputy Clark (when he first saw plaintiff
at the Sonny Rose residence) looked into
plaintiff's small open Cushman and knew that
there was <u>no</u> items from the tack room or the
residence at 609 Fleming Road in his Cushman.
Plaintiff was wearing a tank top and shorts
at the time of the alleged break-in.  Deputy
Clark had personal knowledge that plaintiff
had nothing from the tack room or residence
in his personal possession.

8.  Deputy Clark and Deputy Macias had an
agreement and/or understanding to arrest
plaintiff without probable cause and to
wilfully fail to investigate, wilfully
fabricate evidence, and manufacture probable
cause and conspired to maliciously prosecute
plaintiff ....

Citing *Spurlock v. Satterfield,* 167 F.3d 995, 1004-1007 (6th

Cir. 1999), Plaintiff contends that law enforcement officers are

not entitled to qualified immunity for non-testimonial acts,

i.e., allegations that they wrongfully investigated, prosecuted,

fabricated evidence, manufactured probable cause, and conspired

to maliciously prosecute.

In *Spurlock*, plaintiffs, whose convictions on reprosecution for murder were subsequently vacated, sued the deputy sheriff and other defendants for civil rights violations under Sections 1981, 1983 and 1988, and for malicious prosecution.  On appeal, the Sixth Circuit rejected Defendant Satterfield's assertion that he was entitled to qualified immunity from liability because none of the alleged acts, standing alone, caused constitutional injuries, and that, in any event, these acts did not violate clearly established constitutional rights.  The Sixth Circuit held:

> We conclude that, here, plaintiffs sufficiently raised claims that allege violations of their constitutional and/or statutory rights.  Namely, that Satterfield and other defendants wrongfully investigated, prosecuted, convicted and incarcerated them; that Satterfield fabricated evidence and manufactured probable cause; that they were held in custody, despite a lack of probable cause to do so; and that Satterfield and others conspired to maliciously prosecute and convict them ... Satterfield cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights.  *See Brady,* 373 U.S. at 83 ... (State has duty to disclose exculpatory evidence); *Pyle v. Kansas*, 317 U.S. 213, 216 ... (1942)(knowing use of false testimony to obtain conviction violates Fourteenth Amendment); *Mooney v. Holohan*, 294 U.S. 103, 112-13 ... (1935)(same); *Albright*, 510 U.S. at 274 ... (malicious prosecution of an individual and continued detention of an individual without probable cause clearly violate rights afforded by the Fourth Amendment).
>
> Finding that plaintiffs have sufficiently alleged violations of their constitutional

rights, we next decide whether these
constitutional rights were clearly
established at the time in question.  In so
determining, we may rely on decisions of the
Supreme Court, decisions of this court, and
in limited instances, on decisions of other
circuits ... To be clearly established,
'[t]he contours of the right must be
sufficiently clear that a reasonable officer
would understand what he is doing violates
that right.' ....

This court, in *Smith v. Williams* ... found
that the right to be free from malicious
prosecution was a right clearly established
under the Fourth Amendment ....

Further, the requirement of probable cause is
one of the cornerstones of Fourth Amendment
protection ... Thus, a reasonable police
officer would know that fabricating probable
cause, thereby effectuating a seizure, would
violate a suspect's clearly established
Fourth Amendment right to be free from
unreasonable seizures ... Similarly, a
reasonable police officer would be on notice
that unlawfully detaining a suspect, despite
the fact that the evidence used to detain
that individual was fabricated, would also be
unlawful.  We also find unpersuasive
Satterfield's argument that the act was not
completed, and thus no injury occurred, until
the false testimony was given at trial.  The
injuries alleged here occurred much earlier
than that point - indeed, at the very point
at which Spurlock and Marshall continued to
be detained, despite the lack of probable
cause for such detention.  Thus, Satterfield
is not entitled to qualified immunity for
these alleged acts, because they violated the
plaintiffs' clearly established
constitutional rights.

*Id.* at 1005-1007.  *See also Bretz v. Kelman*, 773 F.2d 1026, 1031

(9th Cir.1985)("[I]f an arrest is made in bad faith, there may be

a cause of action under § 1983 as an illegal, unconstitutional

arrest").

1  Defendants reply that Plaintiff merely repeats the
2  allegations of the FAC and further contend that *Spurlock* is
3  distinguishable because Plaintiff concedes that his cause of
4  action for malicious prosecution is barred by California
5  Government Code § 821.6.

6  Defendants' attempt to distinguish *Spurlock* is without
7  merit.  Although Plaintiff concedes dismissal of the Second Cause
8  of Action for malicious prosecution under state law, the First
9  Cause of Action for violation of Section 1983 also alleges
10 malicious prosecution.

11 Defendants' motion to dismiss on the ground of qualified
12 immunity is DENIED.  As noted above, it is arguable that
13 Defendants did not have probable cause to arrest Plaintiff for
14 trespassing in violation of Penal Code § 602(m) and that
15 Defendants are not entitled to qualified immunity.  *See Edgerly,*
16 *supra,* 599 F.3d at 954.  The facts underlying Plaintiff's arrest
17 for burglary are disputed.  Given Plaintiff's allegations that
18 Defendants fabricated probable cause for the burglary and
19 manufactured evidence, dismissal of the First Cause of Action on
20 the basis of qualified immunity from liability is inappropriate
21 at this juncture.

22     F.   <u>THIRD CAUSE OF ACTION FOR FALSE IMPRISONMENT</u>.

23 Defendants move to dismiss the Third Cause of Action for
24 false imprisonment on two grounds.

25 Defendants cite *Harris v. Business, Transp. and Housing*
26 *Agency*, 2007 WL 1574553 at *8 (N.D.Cal., May 30, 2007):

> A claim for false imprisonment does not
> ordinarily state an independent claim under §
> 1983 absent a cognizable claim for wrongful
> arrest.  *See Baker v. McCollan*, 443 U.S. 137,
> 142-45 ... (1979).

Asserting that Plaintiff has not stated a claim for false arrest,

Defendants contend that the Third Cause of Action fails to state

a claim.

First of all, the Third Cause of Action is predicated on

state law, not Section 1983.  Secondly, the allegations of the

FAC allege that Plaintiff's arrest was not supported by probable

cause but, rather, was based on fabricated facts.

Defendants further move to dismiss the Third Cause of Action

on the ground that Defendants are entitled to immunity from

liability under state law.

Defendants cite California Government Code § 820.2:

> Except as otherwise provided by statute, a
> public employee is not liable for an injury
> resulting from his act or omission whether
> the act or omission was the result of the
> exercise of the discretion vested in him,
> whether or not such discretion was abused.

There is fairly recent California Supreme Court authority

discussing immunity under Section 820.2 for discretionary acts,

which is not cited by Defendants.  In *Caldwell v. Montoya*, 10

Cal.4th 972 (1995), the California Supreme Court, citing *Johnson

v. State*, 69 Cal.2d 782 (1968), ruled:

> ... *Johnson* concluded, a 'workable
> definition' of immune discretionary acts
> draws the line between 'planning' and
> 'operational' functions of government.
> (*Johnson, supra,* 69 Cal.2d at pp. 793, 794.)
> Immunity is reserved for those '*basic policy*

*decisions* [which have] ... been [expressly] committed to coordinate branches of government,' and as to which judicial interference would thus be 'unseemly.'   (*Id.* at p. 793 ....)   Such 'areas of quasi-legislative policy-making ... are sufficiently sensitive' (*id.* at p. 794) to call for judicial abstention from interference that 'might even in the first instance affect the coordinate body's decision-making process' (*id.* at p. 793).

On the other hand, said *Johnson*, there is no basis for immunizing lower-level, or 'ministerial,' decisions that merely implement a basic policy already formulated. (*Johnson*, *supra*, 69 Cal.2d at p. 796.) Moreover, we cautioned, immunity applies only to *deliberate and considered* policy decisions, in which a '[conscious] balancing [of] risks and advantages ... took place. The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision ....' (*Id.* at p. 795, fn. 8).

Recognizing that 'it is not a tort for government to govern' ..., our subsequent cases have carefully preserved the distinction between policy and operational judgments.   Thus, we have rejected claims of immunity for a bus driver's decision not to intervene in one passenger's violent assault against another ..., a college district's failure to warn of known crime dangers in a student parking lot ..., a county clerk's libelous statements during a newspaper interview about official matters ..., university therapists' failure to warn a patient's homicide victim of the patient's prior threats to kill her ..., and a police officer's negligent conduct of a traffic investigation once undertaken ....

On the other hand, we have concluded that the discretionary act statute does immunize officials and agencies against claims that they unreasonably delayed regulations under which a murdered security guard might have qualified himself to carry a defensive

40

> firearm ... or negligently released a violent
> juvenile offender into his mother's custody.

10 Cal.4th at 981-982.  *See also Barner v. Leeds,* 24 Cal.4th 675

(2000).  In *Gillan v. City of San Marino*, 147 Cal.App.4th 1033,

1051 (2007), the Court of Appeals held:

> The decision to arrest Gillan was not a basic
> policy decision, but only an operational
> decision by the police purporting to apply
> the law.  The immunity provided by Government
> Code § 820.2 therefore does not apply.

Defendants' motion to dismiss on the ground of Section 820.2

immunity is DENIED.

Defendants cite California Government Code § 821.6:

> A public employee is not liable for injury
> caused by his instituting or prosecuting any
> judicial or administrative proceeding within
> the scope of his employment, even if he acts
> maliciously and without probable cause.

Plaintiff responds by citing California Government Code §

820.4:

> A public employee is not liable for his act
> or admission exercising due care in the
> enforcement of the law.  Nothing in this
> section exonerates a public employee from
> liability for false arrest or imprisonment.

As explained in *Asgari v. City of Los Angeles*, 15 Cal.4th

744, 751 (1997):

> Under California law, a police officer may be
> held liable for false arrest and false
> imprisonment, but not for malicious
> prosecution.  (§§ 820.4, 821.6).

Here, because Plaintiff concedes dismissal of the Second Cause of

Action for malicious prosecution because of Section 821.6,

Defendants' reliance on Section 821.6 is moot and the motion to

41

1   dismiss on this ground is DENIED.

2       Defendants also cite *Hernandez v. City of Pomona*, 46 Cal.4th
3   501, 207 P.3d 506 (2009), asserting that "the California Supreme
4   Court made it clear that under California law, a law enforcement
5   officer's decision to effectuate a lawful arrest is not
6   actionable in tort."

7       In *Hernandez*, family members of a decedent brought a
8   negligence action against city police officers and the city,
9   after decedent was shot and killed by officers while fleeing
10  arrest.   The California Supreme Court granted review to consider:

11              When a federal court enters judgment in favor
                of the defendants in a civil rights claim
12              brought under 42 United States Code section
                1983 ..., in which the plaintiffs seek
13              damages for police use of deadly and
                constitutionally excessive force in pursuing
14              a suspect, and the court then dismisses a
                supplemental state law wrongful death claim
15              arising out of the same incident, what, if
                any, preclusive effect does the judgment have
16              in a subsequent state court wrongful death
                action?  Based on principles of issue
17              preclusion (collateral estoppel), the Court
                of Appeal held in this case that the federal
18              judgment precludes plaintiffs from recovering
                on the theory that the police officers failed
19              to exercise reasonable care in using deadly
                force, but does not preclude plaintiffs from
20              recovering on the theory that the officers
                failed to exercise reasonable care in
21              creating, through their preshooting conduct,
                a situation in which it was reasonable for
22              them to use deadly force ... As explained
                below, we hold that on the record and
23              conceded facts here, the federal judgment
                collaterally estops plaintiffs from pursuing
24              their wrongful death claim, even on the
                theory that the officers' preshooting conduct
25              was negligent.

26  207 P.3d at 510.   In the course of so holding, the California

Supreme Court stated:

> [W]e agree with defendants that, in light of the finding that the shooting was reasonable, liability in this case may not be based on the officers' alleged preshooting negligence. The starting point for our conclusion is the validity of the initial detention.  Based on the conceded fact that the Thunderbird was being illegally operated at night without lights ..., Officer Cooper was legally justified in attempting to detain both of the car's occupants and asking them to exit the vehicle ... When Hernandez, in response to Cooper's request that he exit the car, moved into the driver's seat and drove off with the headlights unilluminated, Cooper had reasonable cause to believe Hernandez had committed two public offenses: (1) driving during darkness without lighted headlamps ... (2) and wilfully resisting, delaying, or obstructing a peace officer 'in the discharge or attempt to discharge any duty of his or her office.' ....
>
> Because Cooper had probable cause to arrest Hernandez, under both statutes and case law, Cooper was not obliged simply to let Hernandez go.  Long ago, we explained that an officer with probable cause to make an arrest '" is not bound to put off the arrest until a more favorable time"' and is 'under no obligation to retire in order to avoid a conflict.' ... Instead, an officer may 'press forward and make the arrest, using all the force [reasonably] necessary to accomplish that purpose.' ... Consistent with these principles, Penal Code section 835a provides that a peace officer with reasonable cause to make an arrest 'may use reasonable force to effect the arrest' and 'need not retreat or desist from his efforts [to make an arrest] by reason of the resistance or threatened resistance of the person being arrested.' Thus, California law expressly authorized Cooper to pursue Hernandez and to use reasonable force to make an arrest.

*Id.* at 518-519.

    Defendants assert:

> Here, like in *Hernandez*, defendants were not
> only expressly authorized to arrest the
> plaintiff, but had a duty to the community to
> carry out their obligation to promote law-
> abiding, orderly conduct, including, where
> necessary, detaining and arresting suspected
> perpetrators of offenses.  Here, the
> plaintiff was a suspected perpetrator of an
> offense.  As such, the decision to effectuate
> the arrest is not actionable.

Assuming that probable cause existed to arrest Plaintiff,

Defendants are correct that they cannot be liable in tort for

that arrest (except for perhaps excessive force).  However,

*Hernandez* addressed an issue and factual circumstances far

different from those involved in this action.

In Defendants' reply brief, Defendants assert that Plaintiff

did not respond to their assertion of statutory immunities for

state law causes of action.  This is simply not correct;

Plaintiff did respond.  Defendants also assert:

> 'It is well-established that issues adverted
> to in a perfunctory manner, unaccompanied by
> some effort at developed argumentation, are
> deemed waived.'  (*Dillery v. City of
> Sandusky*, 398 F.3d 562, 569 (6th Cir.2005).)
> ' ... the [sic] argument must contain the
> contentions of the appellant on the issues
> presented, and the reasons therefor, with
> citations to the authorities, statutes, and
> parts of the record relied on.'  (*United
> States v. Alonso*, 48 F.3d 1536, 1544 (9th
> Cir.1995).  As plaintiff has not address the
> above issue, he has waived any opposition to
> it.

Plaintiff's response to this aspect of the motion to dismiss

complied with these requirements, even assuming they apply to a

response to a motion to dismiss in the district court.

### CONCLUSION

1    For the reasons stated, Defendants' motion to dismiss the

2 First Amended Complaint is **GRANTED IN PART AND DENIED IN PART.**

3 **The Second Cause of Action for malicious prosecution is DISMISSED**

4 **as barred by California Government Code § 821.6.**

5 IT IS SO ORDERED.

6 **Dated:   May 5, 2010            /s/ Oliver W. Wanger**
                                  UNITED STATES DISTRICT JUDGE